Joel E. Elkins (SBN 256020)
Email: jelkins@weisslawllp.com
**WEISSLAW LLP**
9107 Wilshire Blvd, Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile: 310/209-2348

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN WITMER, On Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> IXIA, ERROL GINSBERG, BETHANY MAYER, LAURENT ASSCHER, JONATHAN FRAM, GAIL HAMILTON, ILAN DASKAL, KEYSIGHT TECHNOLOGIES, INC., and KEYSIGHT ACQUISITION, INC., <br><br> Defendants. | Case No. _____ <br><br> CLASS ACTION <br><br> **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> JURY TRIAL DEMANDED |

Plaintiff, by and through her attorneys, alleges upon personal knowledge as to herself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of Ixia ("Ixia" or the "Company") against Ixia and its Board of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction announced on January 30, 2017 (the "Proposed Transaction"), pursuant to which Ixia will be acquired by Keysight Technologies, Inc. through its wholly-owned subsidiary, Keysight Acquisition, Inc. (collectively, "Keysight").

2.      On January 30, 2017, the Board caused Ixia to enter into an agreement and plan of merger (the "Merger Agreement").   Pursuant to the terms of the Merger Agreement, stockholders of Ixia will receive $19.65 per share in cash.

3.      On February 15, 2016, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Ixia common stock.

9.     Defendant Ixia is a California corporation and maintains its principal executive offices at 26601 W. Agoura Road, Calabasas, CA 91302.  The Company provides application performance and security resilience solutions to organizations in the United States and internationally.  Ixia's common stock is traded on the NasdaqGS under the ticker symbol "XXIA."

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

10.    Defendant Errol Ginsberg ("Ginsberg") is the founder and a director of Ixia and has served as Chairman of the Board since January 2008.

11.    Defendant Bethany Mayer ("Mayer") is a director of Ixia and has served as President and Chief Executive Officer ("CEO") since September 2014.

12.    Defendant Laurent Asscher ("Asscher") has served as a director of Ixia since October 2008.   According to the Company's website, Asscher is a member of the Compensation Committee.

13.    Defendant Jonathan Fram ("Fram") has served as a director of Ixia since July 2005.   According to the Company's website, Fram is Chair of the Nominating and Corporate Governance Committee, a member of the Compensation Committee, and a member of the Audit Committee.

14.    Defendant Gail Hamilton ("Hamilton") has served as a director of Ixia since July 2005.   According to the Company's website, Hamilton is Chair of the Compensation Committee, a member of the Audit Committee, and a member of the Nominating and Corporate Governance Committee.

15.    Defendant Ilan Daskal ("Daskal") is a director of Ixia.   According to the Company's website, Daskal is Chair of the Audit Committee.

16.    The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

17.     Defendant Keysight Technologies, Inc. is a Delaware corporation with its corporate headquarters located at 1400 Fountaingrove Parkway, Santa Rosa, CA 95403.

18.     Defendant Keysight Acquisition, Inc. is a California corporation and a wholly-owned subsidiary of Keysight Technologies, Inc.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of Ixia (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. As of October 31, 2016, there were approximately 82,115,900 shares of Ixia common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.     Background of the Company and the Proposed Transaction**

26.     Ixia provides testing, visibility, and security solutions, strengthening applications across physical and virtual networks for enterprises and governments, service providers, and network equipment manufacturers ("NEMs").

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

27.    The Company helps customers manage the unpredictable world of IT and protects them against security threats through actionable insight into the performance, stability, and security of their applications and networks.

28.    Customers worldwide rely on Ixia's solutions to verify their designs, optimize their performance, and ensure protection.

29.    On August 2, 2016, Ixia issued a press release wherein it reported its financial results for the quarter ended June 30, 2016.

30.    The Company reported that total revenue for the 2016 second quarter was $120.1 million, compared to $112.7 million reported for the 2016 first quarter.

31.    On a GAAP basis, the Company recorded net income of $1.5 million, or $0.02 per diluted share, compared to a net loss of $2.7 million, or $0.03 per diluted share, for the 2016 first quarter.

32.    Non-GAAP net income for the 2016 second quarter was $14.9 million, or $0.18 per diluted share, compared to non-GAAP net income of $7.4 million, or $0.09 per diluted share, for the 2016 first quarter.

33.    With respect to the results, Individual Defendant Mayer, the Company's President and CEO, commented:

> In the second quarter we achieved revenue at the high-end of our guidance range and delivered solid earnings that were driven by our strong gross margin performance and continued focus on financial discipline. We also generated $25.5 million in cash flow from operations and repurchased $6.9 million of Ixia common stock[.] Leveraging technology unique to Ixia, we have continued to add new

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

capabilities across our test, security, and visibility platforms and have brought new products to market that we believe further expand Ixia's technology leadership over the competition.

34.     On November 1, 2016, Ixia issued a press release wherein it reported its financial results for the quarter ended September 30, 2016.

35.     The Company reported that total revenue for the 2016 third quarter was $123.9 million, compared to $120.1 million reported for the 2016 second quarter.

36.     On a GAAP basis, the Company recorded net income for the 2016 third quarter of $4.8 million, or $0.06 per diluted share, compared to net income of $4.0 million, or $0.05 per diluted share, for the 2015 third quarter, and net income of $1.5 million, or $0.02 per diluted share, for the 2016 second quarter.

37.     Non-GAAP net income for the 2016 third quarter was $15.2 million, or $0.18 per diluted share, compared to non-GAAP net income of $12.3 million, or $0.15 per diluted share, for the 2015 third quarter, and non-GAAP net income of $14.9 million, or $0.18 per diluted share, for the 2016 second quarter.

38.     With respect to the results, Individual Defendant Mayer commented:

We are pleased with our results in the third quarter, with revenue and EPS exceeding our guidance. Our revenue performance was driven by growing momentum for our network visibility solutions and record revenue from the enterprise market, which offset softness in our NEM markets[.]  We are continuing to execute and invest in our strategy and are pleased with the early results we have generated from the changes we made to our sales leadership and organization.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

39.     Nevertheless, on January 30, 2017, the Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

40.     To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Keysight and are calculated to unreasonably dissuade potential suitors from making competing offers.

41.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.02(a) of the Merger Agreement states:

> (a) From the execution of this Agreement until the earlier to occur of (x) the date of the termination of this Agreement in accordance with its terms and (y) the Effective Time, except as expressly permitted by Section 5.02(b), the Company shall not, and shall cause its Subsidiaries and its and their respective directors, officers and employees not to, and the Company shall use its reasonable best efforts to cause its and its Subsidiaries' other Representatives not to, directly or indirectly, (i) solicit, initiate, knowingly encourage, or knowingly facilitate any Acquisition Proposal or any inquiry, expression of interest, proposal, offer or request for information that would reasonably be expected to lead to or result in an Acquisition Proposal, or the making or consummation thereof, (ii) other than to inform any Person of the existence of the provisions contained in this Section 5.02, enter into, continue, or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any information in connection with, or enter into any Contract or other

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

agreement or understanding with respect to, any Acquisition Proposal or any inquiry, expression of interest, proposal, offer or request for information that would reasonably be expected to lead to or result in an Acquisition Proposal, or (iii) resolve or agree to do any of the foregoing. From and after the execution of this Agreement, the Company shall, and shall cause its Subsidiaries and direct its and their respective Representatives to (A) immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Acquisition Proposal or any inquiry, expression of interest, proposal, offer or request for information that would reasonably be expected to lead to or result in an Acquisition Proposal, (B) terminate access by any other Person to any physical or electronic data room or other access to data or information of the Company, in each case relating to or in connection with, any Acquisition Proposal or any potential Acquisition Proposal, (C) request the prompt return or destruction of all information provided to any other Person prior to the date of this Agreement in connection with any inquiry, expression of interest, proposal, offer or request for information that would reasonably be expected to lead to or result in an Acquisition Proposal and (D) enforce, and not waive or modify, the provisions of any existing confidentiality or non-disclosure agreement entered into with respect to any Acquisition Proposal or any potential Acquisition Proposal, including any standstill provisions contained therein ( provided that, in the case of clause (D), if the Board of Directors of the Company determines in good faith, after consultation with its outside legal counsel, that the failure to take such action would be inconsistent with the Board of Director's fiduciary duties to the shareholders of the Company under applicable Law, the Company may waive any such standstill provision solely to the extent necessary to permit a third party to make, on a confidential basis to the Board of Directors of the Company, an Acquisition Proposal, conditioned upon such third party agreeing that the Company shall not be prohibited from providing any information to Parent (including regarding any such Acquisition Proposal) in accordance with, and otherwise complying with, this Section 5.02). It is agreed that (1) any violation of the restrictions set forth in this Section 5.02(a) by any officer, director or employee of the Company or any of its Subsidiaries shall constitute a breach of this Section 5.02 by the Company and (2) any inquiry, expression of interest, proposal, offer or request that results from any violation of

the foregoing restrictions by any Representative of the Company or any of its Subsidiaries (other than such Representatives included in the foregoing clause (1)) shall be deemed to be not in compliance with this Section 5.02. The Company hereby releases Parent from its obligation to comply with the standstill provisions contained in its Confidentiality Agreement from and after the date hereof.

42.     Further, the Company must promptly advise Keysight of any proposals or inquiries received from other parties.  Section 5.02(c) of the Merger Agreement states:

> (c) The Company shall notify Parent promptly (but in no event later than twenty four (24) hours) after receipt by the Company or any of its Subsidiaries (or any of its or their Representatives) of any Acquisition Proposal, any inquiry that would be reasonably expected to lead to an Acquisition Proposal or of any request for information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books, or records of the Company or any of its Subsidiaries by any Person that to the knowledge of the Company may be considering making, or has made, an Acquisition Proposal, which notice shall be provided orally and in writing and shall provide the material terms and conditions of, any such Acquisition Proposal, indication, or request (including the identity of the Person making any such Acquisition Proposal, indication or request, and copies of any related documentation, including any related financing commitments). Thereafter, the Company shall keep Parent promptly informed in writing on a reasonably current basis of the status of, and any material changes to, the terms of any such Acquisition Proposal (including providing Parent a notification in writing within twenty-four (24) hours following any determination by the Board of Directors of the Company pursuant to Section 5.02(b) or any material changes to the terms of any such Acquisition Proposal) and any discussions and negotiations concerning the material terms and conditions thereof.

43.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the

Proposed Transaction under extremely limited circumstances, and grants Keysight

a "matching right" with respect to any "Superior Proposal" made to the Company.

Sections 5.02(f) and (g) of the Merger Agreement provide:

> (f) Notwithstanding anything to the contrary in this Agreement, if at any time prior to obtaining the Company Shareholder Approval, a written bona fide Acquisition Proposal that is first made after the date hereof and did not result from a breach of this Section 5.02 is made, and the Board of Directors of the Company concludes in good faith, after consultation with its financial advisor and outside legal counsel, that such Acquisition Proposal constitutes a Superior Proposal and the failure to approve or recommend such Superior Proposal would be inconsistent with the Board of Director's fiduciary duties to the shareholders of the Company under applicable Law, the Board of Directors of the Company may make a Company Adverse Recommendation Change and/or the Company may terminate this Agreement in accordance with this Section 5.02(f) and Section 7.01(e), provided, however, that the Company shall not terminate this Agreement pursuant to this Section 5.02(f) or Section 7.01(e) unless the Company (i) has complied with and not breached its obligations under this Section 5.02, including its obligations set forth in Section 5.02(g), (ii) pays, or causes to be paid, to Parent the Company Termination Fee prior to or concurrently with such termination and (iii) concurrently with such termination, enters into a definitive written Alternative Acquisition Agreement that documents all the terms and conditions of such Superior Proposal.

> (g) Notwithstanding anything to the contrary in this Agreement, the Board of Directors shall not make a Company Adverse Recommendation Change pursuant to Section 5.02(f) and the Company shall not be entitled to terminate this Agreement pursuant to Section 5.02(f) or Section 7.01(e) unless (i) the Company shall have provided Parent at least five (5) Business Days' prior written notice advising Parent that it intends to take such action, which notice shall (A) state that the Company has received a Superior Proposal, (B) specify the material terms and conditions of such Superior Proposal, including the identity of the Person making such Superior Proposal, and (C) enclose the most recent draft of any agreements intended to be

entered into with the Person making or providing such Superior Proposal (or any Affiliate of such Person), (ii) if requested by Parent, the Company and its Representatives shall have negotiated in good faith during such five (5) Business Day period following delivery of such written notice with Parent concerning any revisions to the terms of this Agreement that Parent proposes in response to such Superior Proposal and (iii) after complying with clauses (i) and (ii) of this Section 5.02(g), the Board of Directors shall have determined in good faith, after consultation with its outside legal counsel and financial advisor, that such Acquisition Proposal continues to constitute a Superior Proposal, after giving due consideration to any changes proposed to be made to this Agreement by Parent in a writing. The parties acknowledge and agree that, (A) if Parent, within five (5) Business Days following its receipt of the written notice referred to in this Section 5.02(g), makes a proposal that, as determined in good faith by the Board of Directors of the Company (after consultation with its outside counsel and financial advisor), results in the applicable Acquisition Proposal no longer being a Superior Proposal, then the Board of Directors shall have no right to make a Company Adverse Recommendation Change pursuant to Section 5.02(f) and the Company shall have no right to terminate this Agreement pursuant to Section 5.02(f) or Section 7.01(e) as a result of such Acquisition Proposal, and (B) any (x) revisions to the financial terms or any other material terms of a Superior Proposal or (y) revisions to the financial terms or any other material terms to an Acquisition Proposal that the Board of Directors of the Company had determined no longer constitutes a Superior Proposal, shall constitute a new Acquisition Proposal and shall in each case require the Company to deliver to Parent a new written notice pursuant to this Section 5.02(g) and a new five (5) Business Day period shall commence thereafter; provided, however, that such new five (5) Business Day notice period shall be shortened to three (3) Business Days if the only change to the material terms of such Superior Proposal is an increase in (without any change to the form of) the per share merger consideration. The Board of Directors of the Company shall have no right to make a Company Adverse Recommendation Change pursuant to Section 5.02(f) and the Company shall have no right to terminate this Agreement pursuant to Section 5.02(f) or Section 7.01(e) unless it has complied with the procedures set forth in Section 5.02(f) and this Section 5.02(g).

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

44.     Further locking up control of the Company in favor of Keysight, the Merger Agreement provides for a "termination fee" of $59.7 million, payable by the Company to Keysight if the Individual Defendants cause the Company to terminate the Merger Agreement.

45.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

46.     Additionally, Individual Defendant Asscher, Katelia Capital Group Ltd., Errol Ginsberg, and The Errol Ginsberg and Annette R. Michelson Family Trust dated October 13, 1999 have entered into voting and support agreements, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction.  Accordingly, such shares are already locked up in favor of the merger.

47.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

48.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

49.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

50.     For example, Individual Defendant Mayer stands to receive $11,316,992 in connection with the Proposed Transaction.   Three of the Company's other named executive officers stand to receive $14,291,785.

51.     Moreover, according to the Proxy Statement, "it is expected that certain of [the Company's] executive officers may, prior to or upon completion of the merger, enter into new employment arrangements with Keysight, with the surviving corporation, or with one of their respective affiliates."

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

52.     Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

53.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

54.     First, the Proxy Statement omits material information regarding the Company's financial projections and the financial analysis performed by the Company's financial advisor, Deutsche Bank Securities Inc. ("Deutsche Bank"), in support of its so-called fairness opinion.

55.     With respect to Ixia's financial projections, the Proxy Statement fails to disclose:  (i) a reconciliation of all non-GAAP to GAAP metrics; (ii) stock based

compensation; (iii) taxes; (iv) capital expenditures; (v) change in working capital; (vi) depreciation and amortization; and (vii) the methodology, inputs, and assumptions by which Deutsche Bank calculated the unlevered free cash flow amounts for fiscal years ended December 31, 2020 and 2021.

56.     With respect to Deutsche Bank's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) the inputs and assumptions underlying the range of perpetuity growth rates of 2.5% to 3.5% and the metric to which the growth rates were applied; (ii) the calculated range of terminal values; and (iii) the inputs and assumptions underlying the calculated discount rate range of 10.0% to 12.0%.

57.     With respect to Deutsche Bank's *Selected Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Deutsche Bank in its analysis.

58.     With respect to Deutsche Bank's *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Deutsche Bank in its analysis.

59.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

60.    The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of the Ixia Board; Reasons for the Merger"; (iii) "Opinion of Ixia's Financial Advisor"; and (iv) "Certain Ixia Unaudited Prospective Financial Information."

61.    Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

62.    Specifically, while the Proxy Statement states that "it is expected that certain of [the Company's] executive officers may, prior to or upon completion of the merger, enter into new employment arrangements with Keysight, with the surviving corporation, or with one of their respective affiliates[,]" the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Ixia's officers and directors, including who participated in all such communications.

63.    Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This

information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

64.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Recommendation of the Ixia Board; Reasons for the Merger"; and (iii) "Interests of Our Directors and Executive Officers in the Merger."

65.     Third, while the Proxy Statement provides that "Ixia has agreed to pay Deutsche Bank a percentage of any payment to which it is entitled under the merger agreement in connection with the termination thereof," the Proxy Statement fails to disclose the percentage of such payment potentially payable to Deutsche Bank.

66.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

67.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy

Statement:   (i) "Background of the Merger"; (ii) "Recommendation of the Ixia Board; Reasons for the Merger"; and (iii) "Opinion of Ixia's Financial Advisor."

68.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Ixia's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Ixia

69.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Ixia is liable as the issuer of these statements.

71.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

72.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

73.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

74.    The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

75.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

76.    Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Keysight

77.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.    The Individual Defendants and Keysight acted as controlling persons of Ixia within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Ixia and participation in and/or awareness of the Company's operations and/or intimate knowledge of the

false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

79.     Each of the Individual Defendants and Keysight was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

80.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

81.     Keysight also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

82.     By virtue of the foregoing, the Individual Defendants and Keysight violated Section 20(a) of the 1934 Act.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

83.     As set forth above, the Individual Defendants and Keysight had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1         E.     Awarding plaintiff the costs of this action, including reasonable

2    allowance for plaintiff's attorneys' and experts' fees; and

3

4         F.     Granting such other and further relief as this Court may deem just and

5    proper.

6    **JURY DEMAND**

7

8         Plaintiff respectfully requests a trial by jury on all issues so triable.

9    Dated:  February 23, 2017          **WEISSLAW LLP**

10

11                  By: _____

12                      Joel E. Elkins (SBN 256020)

13                      9107 Wilshire Blvd, Suite 450
                   Beverly Hills, CA 90210

14                      Telephone: 310/208-2800
                   Facsimile: 310/209-2348

15                      Email: jelkins@weisslawllp.com

16                      *Attorneys for Plaintiff*

**OF COUNSEL:**

17

18   **RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky

19   Brian D. Long
Gina M. Serra

20   2 Righter Parkway, Suite 120
Wilmington, DE 19803

21   (302) 295-5310

22

23   **RM LAW, P.C.**

24   1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312

25   (484) 324-6800

26

27

28

23
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

## CERTIFICATION OF PLAINTIFF

I, COLLEEN WITMER ("Plaintiff"), hereby declare as to the claims asserted under the federal securities laws that:

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, and I will testify at deposition or trial, if necessary.  I understand that this is not a claim form and that I do not need to execute this Certification to share in any recovery as a member of the class.

4.      Plaintiff's purchase and sale transactions in the Ixia (NasdaqGS: XXIA) security that is the subject of this action during the class period is/are as follows:

<table>
<tr><td colspan="3" align="center">PURCHASES</td><td colspan="3" align="center">SALES</td></tr>
<tr><th>Buy Date</th><th>Shares</th><th>Price per Share</th><th>Sell Date</th><th>Shares</th><th>Price per Share</th></tr>
<tr><td>12/30/09</td><td>113</td><td>7.23</td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
</table>

*Please list additional transactions on separate sheet of paper, if necessary.*

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.     During the three years prior to the date of this Certification, Plaintiff has not moved to serve as a representative party for a class in an action filed under the federal securities laws.

7.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of February, 2017.

COLLEEN WITMER